IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AT AMARILLO

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC – 4 2006

CLERK, U.S. DISTRICT COURT
By _____
         Deputy

1

2

3

4   SWIFT AND COMPANY,

5        Plaintiff,                                  No. 2-06CV-314-J

6        v.

7   IMMIGRATION AND CUSTOMS              **DEFENDANTS' MEMORANDUM IN
    ENFORCEMENT DIVISION OF THE          OPPOSITION TO PLAINTIFF'S
8   DEPARTMENT OF HOMELAND               MOTION FOR PRELIMINARY
    SECURITY and JULIE L. MYERS,         INJUNCTION**

9        Defendants

10  _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  I.    SWIFT HAS FAILED TO MAKE THE HIGH SHOWING NECESSARY
        FOR A PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. SWIFT HAS NOT DEMONSTRATED A SUBSTANTIAL LIKELIHOOD
       OF SUCCESS ON THE MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.  The Statutes On Which Swift Relies Do Not Create A Private Cause Of
            Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.  Swift Cannot Demonstrate That ICE Is Violating The Basic Pilot Program
            Statute And Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        3.  Swift Cannot Demonstrate A Likelihood Of Success On Its Due Process Claim
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        4.  INA § 242(f) Deprives Courts Of Jurisdiction To Enter An Injunction Against
            The Operation of INA § 236. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        5.  The Court Ought Not Enjoin Judicial Officers In Other Judicial Districts . . . . 13

    B. SWIFT HAS NOT ESTABLISHED THAT IT WILL SUFFER IRREPARABLE
       HARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C. THE BALANCE OF HARMS TIPS AGAINST SWIFT . . . . . . . . . . . . . . . . . . . 15

    D. THE PUBLIC INTEREST CLEARLY FAVORS THE GOVERNMENT'S ABILITY
       TO ENFORCE IMMIGRATION LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF SERVICE

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

i

# TABLE OF AUTHORITIES

## CASES

Aetna Life Ins. Co. Of Hartford, Conn. v. Haworth,
    300 U.S. 227 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In Re Alameda County Assessor's Parcel Nos. 537-801- 2-4 & 537-850-9,
    672 F. Supp. 1278 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Alexander v. Sandoval,
    532 U.S. 275 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Babcock & Wilcox Co. v. Marshall,
    610 F.2d 1128 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Bergh v. State of Washington,
    535 F.2d 505 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Baldwin Metals Co., Inc., v. Donovan,
    642 F.2d 768 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Blackie's House of Beef, Inc. v.Castillo,
    569 F.2d 1211 (D.C. Cir. 1981), cert. denied,
    455 U.S. 940 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bunker Hill Co. Lead & Zinc Smelter v. EPA,
    658 F.2d 1280 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Canal Authority of State of Florida v. Callaway,
    489 F.2d 567 (5th Cir.1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cannon v. University of Chicago,
    441 U.S. 677 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Carter v. Baltimore County, Maryland,
    95 Fed. Appx. 471 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Clark v. Prichard,
    812 F.2d 991 (5th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Coalition for Economic Equity v. Wilson,
    122 F.3d 718 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Del Mar Avionics v. Quinton Instruments Co.,
    645 F.2d 832 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Enterprise Intern. v. Corporacion Estatal Petrolera Ecuatoriana,
    762 F.2d 464 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Establishment Inspection of Keokuk Steel Castings,
    638 F.2d 42 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

FTC v. Standard Oil Co. of California,
    449 U.S. 232 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397


*Former Employees of Alcatel Telecommunications Cable v. Herman,*
  134 F. Supp. 2d 445 (Ct. Int'l Trade 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gunaydin v. INS,*
  742 F.2d 776 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Holland Am. Ins. Co. v. Succession of Roy,*
  777 F.2d 992 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Humana, Inc. v. Jacobson,*
  804 F.2d 1390 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*INS v. Hibi,*
  414 U.S. 5 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*INS v. Miranda,*
  459 U.S. 14 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*INS v. Phinpathya,*
  464 U.S. 194 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Johnson v. United States,*
  333 U.S. 10 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jones v. Alexander,*
  609 F.2d 778 (5th Cir.  1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lewis v. U.S.,*
  70 F.3d 597 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Marshall v. Barlow's, Inc.,*
  436 U.S. 307 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Mathews v. Eldrige,*
  424 U.S. 319, 334 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Midwest Growers Co-op Corp. v. Kirkemo,*
  533 F.2d 455 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Mississippi Power & Light Co. v. United Gas Pipe Co.,*
  760 F.2d 618 (5th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Naegele Outdoor Advertising Co. of Louisville v. Moulton,*
  773 F.3d 692 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*National-Standard Co. v. Adamkus,*
  881 F.2d 352 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Repurchase Corporation, Debtor,*
  329 B.R. 832 (N.D. Ill. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

Saleh v. Titan Corp.,
    353 F. Supp. 2d 1087 (S.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Savoury v. U.S. Attorney General,
    449 F.3d 1307 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Schilling v. Rogers,
    363 U.S. 666 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Skelly Oil Co. v. Phillips Petroleum Co.,
    339 U.S. 667 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Society of Separationists, Inc. v. Herman,
    939 F.2d 1207 (5th Cir.1991), rev'd en banc on other grounds,
    959 F.2d 1283 (5th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Stanley Plating Co., Inc.,
    637 F. Supp. 71 (D. Conn. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Stoddard Lumber Co. v. Marshall,
    627 F.2d 984 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Touche Ross & Co. v. Redington,
    442 U.S. 560 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

West Gulf Maritime Ass'n. v. Ila Deep Sea Local 24,
    751 F.2d 721 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## STATUTES

**The Immigration and Nationality Act of 1952, as amended:**

Section 236,
    8 U.S.C. § 1226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Section 236(a),
    8 U.S.C. § 1226(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Section 242(f),
    8 U.S.C. § 1252(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Section 287(a)(1),
    8 U.S.C. § 1357(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## OTHER STATUTES:

28 U.S.C. § 1491(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 2202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C. 20004-1703
Tel (202) 616-9752; Fax (202) 233-0397

1

**The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2153 (2002):**

2

Section 441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C. 20004-1703
Tel (202) 616-9752; Fax (202) 233-0397

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AT AMARILLO

2

3

4   SWIFT AND COMPANY,

5          Plaintiff,                                    No. 2-06CV-314-J

6   v.                                                   **DEFENDANTS' MEMORANDUM IN**
                                                         **OPPOSITION TO PLAINTIFF'S**
7   IMMIGRATION AND CUSTOMS                              **MOTION FOR PRELIMINARY**
    ENFORCEMENT DIVISION OF THE                          **INJUNCTION**
8   DEPARTMENT OF HOMELAND
    SECURITY and JULIE L. MYERS,

9
           Defendants
10

11          Respondents respectfully submit this Memorandum in Opposition to Plaintiff's Motion for

12   a Preliminary Injunction.

13                                    **INTRODUCTION**

14          Plaintiff, Swift & Company ("Swift"), seeks to enjoin Defendants from conducting a series

15   of law enforcement actions designed to enforce the nation's immigration laws by identifying and

16   detaining illegal immigrants who are working at several of Swift's worksites.  Indeed, Swift's

17   institution of this action is tantamount to an admission that it is illegally employing a substantial

18   number of illegal aliens who are working illegally at those worksites and are also likely engaging

19   in identity theft and fraud.  Swift nonetheless contends that the United States Constitution and the

20   1996 immigration reforms prevent U.S. Immigration and Customs Enforcement ("ICE") from

21   enforcing the immigration laws, and instead somehow require the government to cooperate with

22   law breakers and proceed "slow[ly]" before executing its enforcement activities.    Pl.

23   Memorandum, at 22.

24          Needless to say, the government is not so hamstrung.  Put simply, there is no constitutional

25   or statutory right for anyone to continue violating the law, and the government need not work on

26   a potential law violator's time-table, especially where, as here, doing so would severely undermine

27   legitimate law enforcement operations.  The immigration statute on which Swift relies provides

28   no private cause of action that would permit this suit, and in any event Swift cannot establish that

MEM. DFTS' OPP. TO P.I. – 1
(2-06CV-314-J)

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

ICE's workplace enforcement actions will violate that statute. As for Swift's due process claim, all that Swift can legitimately demand here is that ICE obtain warrants from neutral magistrates before entering Swift's premises, something that ICE has every intention of doing. This Court should reject Swift's unprecedented request to allow Swift – rather than ICE and the various judicial officers all across the country who will consider ICE's warrant applications – to set its own schedule for when, if it ever does, it will comply with the law.

Defendants respectfully request a decision from the Court on Wednesday, December 6, because ICE plans to execute the work enforcement action in the near future. ICE will need a few days for final preparation before the start of the action.

## STATEMENT OF FACTS[1]

This case had its genesis on February 14, 2006, when the ICE office in Des Moines, Iowa, opened an investigation into the Swift pork processing plant in Marshalltown, Iowa. Declaration of Matthew C. Allen ("Allen Decl.") at ¶ 4, submitted as Exhibit 1, Appendix 2. The investigation was prompted when ICE conducted interviews of illegal aliens in local jails who were Swift Marshalltown employees. Id. Thereafter, ICE served an administrative subpoena on Swift requiring that it provide the ICE Des Moines office with Employment Eligibility forms (Form I-9) concerning current employees. Id. (Appendix 2-3.) ICE's investigation and review of the forms raised the suspicion that a substantial number of Swift employees were illegal aliens and who had probably engaged in identity theft to secure employment with Swift, id. (Appendix 3), and thereby were unauthorized to work and were most likely illegally present in the United States.

ICE later served additional administrative subpoenas on Swift, which compelled Swift to produce I-9's from seven other plants located in the United States. Id. at ¶ 6. ICE agents then examined several thousand I-9 forms and noted similar suspect patterns to those discovered in the Marshalltown investigation. Id. As explained by ICE's Acting Deputy Assistant Director Allen, "These patterns suggested that, company-wide, a substantial number of Swift employees were

---

[1] In Plaintiff's Certificate of Interested Parties, Swift incorrectly alleges (with no support whatsoever) that ICE Assistant Secretary Julie L. Myers has a financial interest in the outcome of this case. Ms. Myers is sued only in her official capacity, and she has no financial interest of any kind in this lawsuit.

MEM. DFTS' OPP. TO P.I. – 2
(2-06CV-314-J)

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

1  illegal aliens who had engaged in identity theft in order to obtain employment with the company."

2  Id.  In fact, in a letter to ICE, Swift's Senior Vice President of Human Resources acknowledged

3  "some limitations in our hiring practices and policies, principally related to third-party document

4  fraud."  Id.  And in a meeting with ICE representatives on September 21, 2006, Swift

5  representatives further acknowledged that there "might be some low level criminality within their

6  plants (referring to possible [illegal] document vendors)."  Id.

7  ICE had reason to believe the illegal activity was far greater than Swift conceded and

8  therefore continued its investigation.  See Allen Decl. at ¶ 7 (Appendix 3-4).  In an extraordinary

9  gesture of cooperation, ICE agreed to meet with Swift again on October 19, 2006.  Id. (Appendix

10  4).  During that meeting, Swift asked if ICE was investigating all of its plants.  ICE indicated that

11  the problem was large in scale and that Swift should begin to hire replacement workers.  Id.  After

12  these meetings, ICE sought Swift's consent to engage in contemporaneous, consensual interviews

13  of Swift employees in Marshalltown; Worthington, Minnesota; Grand Island, Nebraska; Cactus,

14  Texas; Hyrum, Utah; and Greeley, Colorado.  Id.  Swift countered by requesting that ICE run a

15  small-scale operation, arresting only a few aliens at a time.  Id.  In addition, working with ICE, the

16  U.S. Attorney for the Southern District of Iowa requested further documentation from Swift, as

17  well as Swift's consent to conduct contemporaneous interviews at Swift's plants.  Id.  Swift agreed

18  to provide the documents to the U.S. Attorney's Office, but it declined to consent to

19  contemporaneous consensual interviews.  Id.  Instead, Swift expressed its desire to have a phased

20  or "managed" interview approach.  Id.  When ICE asked Swift what this meant, the only

21  explanation Swift gave for such an approach was that it would involve addressing a single plant

22  at a time.  Id. at ¶ 8.

23  In ICE's judgment, proceeding in the manner proposed by Swift would enable a substantial

24  number of illegal employees and the perpetrators of identify theft to avoid detection.  Id. at ¶ 9

25  (Appendix 4-5).  As ICE's Acting Deputy Assistant Director Allen states in his declaration, "based

26  upon experience and information available to ICE, the initiation of interviews by ICE agents at

27  one plant would only serve to alert illegal aliens and identity theft perpetrators employed at other

28  locations."  Id.  Indeed, in ICE's judgment, initiating interviews at only one plant would lead to

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752; Fax (202) 233-0397

1  the disappearance of both illegal aliens and stolen identities. Id. (Appendix 5). Because Swift was

2  unwilling to cooperate, ICE planned to seek administrative warrants in each of the districts in

3  which a targeted worksite is present.  Id. at ¶ 2 (Appendix 2).  ICE developed a considered

4  operational plan to conduct the workplace enforcement actions in a way that minimized

5  disruptions nad ensured the safety of Swift employees and federal agents. Id. at ¶ 10 (Appendix

6  5).  To this end, it coordinated its planning with the U.S. Department of Agriculture to obtain

7  information about plant operations, schedules, and safety considerations. Id. ICE also coordinated

8  with the Food Safety Inspection Service within the Department of Agriculture to plan on

9  conducting the operation with the minimum risk of product contamination within the plants. Id.

10  "All ICE agents and managers participating in the operation have been, and will continue to be,

11  thoroughly briefed and trained with respect to the planned operational concerns." Id.  These

12  concerns informed ICE's decision to continue to engage in discussions to negotiate a coordinated

13  operation with Swift management, even after the instant action was initiated. Id. at ¶ 8 (Appendix

14  4).

## ARGUMENT

15

16  I.   SWIFT HAS FAILED TO MAKE THE HIGH SHOWING NECESSARY FOR A
     PRELIMINARY INJUNCTION.

17
         In determining whether to grant a preliminary injunction, the Court considers: (1) a

18  substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury to

19  plaintiff if an injunction is not granted; (3) the extent to which the balance of hardships favors

20  plaintiff; and (4) whether the public interest will be disserved by the injunction. Clark v. Prichard,

21  812 F.2d 991, 993 (5th Cir.1987); Canal Authority of State of Florida v. Callaway, 489 F.2d 567,

22  572 (5th Cir.1974) (en banc).  "In considering these four prerequisites, the court must remember

23  that a preliminary injunction is an extraordinary and drastic remedy which should not be granted

24  unless the movant clearly carries the burden of persuasion." Canal Authority, 489 F.2d at 573.

25  These requirements are not balanced, but rather each one must be met before the court can grant

26  emergency injunctive relief.  Mississippi Power & Light Co. v. United Gas Pipe Co., 760 F.2d

27  618, 621 (5th Cir.1985). Because Swift cannot meet a *single one* of these factors, the Court should

28  deny the request for a preliminary injunction.

MEM. DFTS' OPP. TO P.I. – 4
(2-06CV-314-J)

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

1  Most significantly, Swift cannot show any likelihood, let alone a significant likelihood, of
2  success on the merits for at least five reasons.  First, the statutes upon which Swift relies do not
3  create a private cause of action.  See Section A.1, infra.  Second, Swift has failed to show that ICE
4  is violating the Basic Pilot Program Statute.  See Section A.2, infra.  Third, Swift has failed to
5  show that ICE is violating Swift's Due Process rights.  See Section A.3, infra.  Fourth, the Court
6  lacks jurisdiction to enter an injunction against the arrest and detention of illegal aliens.  See
7  Section A.4, infra.  Fifth, the Court lacks authority to enjoin judicial officers in other judicial
8  districts.  See Section A.5, infra.

9  In addition, Swift cannot satisfy any of the other requirements for obtaining a preliminary
10  injunction.  Swift cannot demonstrate irreparable harm because the only harm it alleges is the loss
11  of business – apparently generated in large measure by its employment of illegal aliens – resulting
12  from legitimate law enforcement activities.  When laws are enforced, law violators (here the
13  illegally employed workers and those employing them) suffer harm , but that does not permit a
14  court to enjoin legitimate law enforcement activities.  See Section B, infra.  Moreover, the
15  Government's law-enforcement activities and interest will suffer substantial harm from an
16  injunction.  Those harms far outweigh the harms feared by Swift.  See Section C, infra.  For the
17  same reason, the public interest strongly disfavors granting the requested preliminary injunction.
18  Not only is the public interest served by allowing enforcement of the immigration laws, but
19  permitting ICE to proceed with the planned workforce actions benefits the public interest by
20  detaining – and eventually removing – a large number of illegal aliens who, in addition to violating
21  our immigration laws, are likely engaging in identity fraud by unlawfully assuming the identity
22  of United States citizens.  See Section D, infra.  Any contrary ruling would create a "safe harbor"
23  for illegal activity by crediting the claim that enforcing our nation's laws is too burdensome on
24  businesses with illegal employees.

25  A.  SWIFT HAS NOT DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

26  1.  The Statutes On Which Swift Relies Do Not Create A Private Cause Of Action.

27  As an initial matter, Swift has failed even to state a cause of action.  The Supreme Court
28  has reaffirmed that:

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

1     private rights of action to enforce federal law must be created by Congress. The

2     judicial task is to interpret the statute Congress has passed to determine whether it
    displays an intent to create not just a private right but also a private remedy.

3     Statutory intent on this latter point is determinative. Without it, a cause of action
    does not exist and courts may not create one . . . .

4   Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001) (citations omitted). The starting point for

5   such an analysis is the "text and structure" of the statute at issue. Id. at 288; see also Touche Ross

6   & Co. v. Redington, 442 U.S. 560, 568 (1979).

7      Although Swift's Complaint is less than clear, the most generous reading of it is that Swift

8   is asserting a cause of action under both the Declaratory Judgment Act and the Illegal Immigration

9   Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). But like the statute at issue in

10   Touche Ross, neither statute "purport[s] to create a private cause of action in favor of anyone."

11   Id. at 569. Indeed, the Supreme Court has already ruled that the Declaratory Judgment Act does

12   not itself create an independent cause of action. See Skelly Oil Co. v. Phillips Petroleum Co., 339

13   U.S. 667, 671-72 (1950) (Declaratory Judgment Act provides discretionary procedural remedy but

14   does not confer or otherwise expand jurisdiction to hear a claim); see also Schilling v. Rogers, 363

15   U.S. 666 (1960) (same).

16      Likewise, IIRIRA says nothing about any right to sue to enforce its provisions, and this

17   silence is determinative. Even if IIRIRA's requirements concerning the Basic Pilot program were

18   somehow construed as bestowing rights upon an interested employer, and even if an immigration

19   enforcement action against employees would burden those rights (a point the Government does

20   not concede), such a construction would not automatically give rise to a private right of action that

21   would allow an employer to enforce its provisions. The Supreme Court has emphasized that "'the

22   fact that a federal statute has been violated and some person harmed does not automatically give

23   rise to a private cause of action in favor of that person.'" Touche Rosse, 442 U.S. at 568, quoting

24   Cannon v. University of Chicago, 441 U.S. 677, 688 (1979). Congress still must express an intent

25   in the statutory scheme to provide for a private cause of action. See Alexander, 532 U.S. at 290

26   (even "statutes that admittedly create substantive private rights" do not provide private cause of

27   action absent Congressional intent). In this case, the statutes at issue do not evince any such intent

28   to create substantive private rights, let alone a private cause of action.

MEM. DFTS' OPP. TO P.I. – 6
(2-06CV-314-J)

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C. 20004-1703
Tel (202) 616-9752; Fax (202) 233-0397

2. <u>Swift Cannot Demonstrate That ICE Is Violating The Basic Pilot Program Statute And Agreement.</u>

Even if IIRIRA authorized Swift to bring this action, Swift cannot establish a likelihood of success on ints IIRIRA claims. First, Swift contends that ICE's planned enforcement action would violate IIRIRA, Complaint at 27-30; Pl. Memorandum at 7, 13-16, but nothing in IIRIRA prevents workplace enforcement actions or precludes ICE from obtaining a warrant to enter plaintiff's facilities and arrest (and detain) illegal aliens.

As relevant to this case, IIRIRA created the Basic Pilot Program Employment Eligibility Verification system ("Basic Pilot"), a web-based system that helps employers determine whether newly hired employees are authorized to work. Allen Decl. at ¶ 3 (Appendix 2); Plaintiff's Appendix at 218, Basic Pilot Memorandum of Understanding, Art. I. Contrary to Swift's claims, Basic Pilot is not a blanket prohibition on workplace enforcement actions. To the contrary, an employer who signs the Memorandum of Understanding ("MOU") to participate in Basic Pilot affirmatively agrees to allow DHS (or its authorized agents or designees) to make periodic visits to the employer for the purpose of "reviewing Basic Pilot-related records, i.e., Forms I-9, SSA Transaction Records, and Department of Homeland Security verification records, that were created during the Employer's participation in the Basic Pilot Program." MOU, Art. II(C)14. Further, under the MOU, "[t]he Department of Homeland Security reserves the right to conduct Form I-9 compliance inspections during the course of the Basic Pilot, <u>as well as to conduct any other enforcement activity authorized by law</u>." MOU, Art. II(C)6 (emphasis added).

Despite the plain terms of the MOU, Swift contends that, as a participant in the program, it is shielded from workplace enforcement actions. But Swift's only argument is based on a provision that is wholly irrelevant to this dispute. Specifically, Swift relies on a section that says a participant cannot be "<u>civilly or criminally liable</u> under any law for any action taken in good faith reliance on <u>information provided through the confirmation system</u>." <u>See</u> MOU Art. II(C)(6)(5) (emphases added); <u>see also</u> 110 Stat. 663 (1996). For two reasons, this provision is inapposite.

First, ICE's workplace enforcement action does not impose "civil[] or criminal[] liab[ility]" on Swift. "Civil liability" is the "amenability to civil action as distinguished from amenability to criminal prosecution. A sum of money assessed either as general, special, or liquidated damages;

1  may be either single, double or treble for violation such as overcharges." Black's Law Dictionary

2  (5th ed. 1979) at 223.  Unquestionably, ICE's actions of entering Swift's premises, talking to the

3  workers, and rooting out illegal aliens is the inititation of a civil action, and does not make Swift

4  "civilly liable."

5      Indeed, if such actions constituted a "civil liability," then the MOU would be internally

6  inconsistent.  As noted, the MOU expressly permits DHS "to conduct Form I-9 compliance

7  inspections [of employer premises]. . . as well as to conduct any other enforcement activity

8  authorized by law." MOU, Art. II(C)6.  Conveniently, Swift omits and ignores this language,

9  which immediately follows the MOU text that Swift asserts is determinative, and which cannot

10  be reconciled with Swift's unnatural interpretation of "civil liability." Far from prohibiting the

11  workplace enforcement action, the MOU recognizes DHS's right to conduct it.

12      In an effort to avoid this language, Swift attempts to conflate the terms "irreparable harm,"

13  "de facto penalty" and "de facto taking," with the term "civil liability." Pl. Memorandum at 14-16.

14  with the .  Unsurprisingly, Swift cites no authority equating these terms.  Nor does Swift attempt

15  to make an argument that the MOU or IIRIRA intended to displace the common understanding

16  of "civil liability."[2]  Thus, under the plain terms of the MOU and the statute, Swift's claim fails.

17      Second, ICE's workplace enforcement action is not predicated on "information provided

18  through the confirmation system." 110 Stat. 663. As explained by ICE's Acting Deputy Assistant

19  Director Allen, "Basic Pilot data is not used as the basis for worksite enforcement activity. . . .

20  [I]nformation ICE obtained and used in analyzing Swift's workforce was neither derived from nor

21  based on Basic Pilot data." Allen Decl. at ¶ 3 (Appendix 2) (emphasis added).  Because ICE's

22  assessment that a substantial number of Swift employees had likely lied about their identities to

23  secure employment and any resulting investigative or enforcement activity was "not based on any

24  Basic Pilot information," id. at ¶ 5 (Appendix 3), Swift cannot demonstrate as likelihood of

25  success on this claim.

26

27

28  [2] Understandably, Swift does not contend that ICE's civil workplace enforcement action is
"criminal liability."

MEM. DFTS' OPP. TO P.I. – 8
(2-06CV-314-J)

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

### 3. Swift Cannot Demonstrate A Likelihood Of Success On Its Due Process Claim.

Swift's only other claim is that ICE's anticipated workplace enforcement action violates the Due Process Clause of the Fifth Amendment. According to Swift, that action will deprive Swift of a property interest, and thus "there must be notice of [the action] and an expedited hearing prior to such action." Pl. Memorandum at 19 (emphasis in original). This claim is wholly without merit – and thus Swift cannot demonstrate a likelihood of success on this claim – for several reasons.

First, and most fundamentally, no Constitutional right requires the Government to provide notice of a planned law enforcement action to a person or company that may be violating the law. See, e.g., Naegele Outdoor Advertising Co. of Louisville v. Moulton, 773 F.3d 692, 694 (6th Cir. 1985) ("[T]here is no federally guaranteed constitutional right to a hearing or other process before the issuance and execution of a search warrant beyond the demands of the Fourth Amendment."); Carter v. Baltimore County, Maryland, 95 Fed. Appx. 471, 478 (4th Cir. 2004) (finding no due process violation in an arrest and detention on a properly-issued warrant). But Swift's argument, if credited, would require such notice any time that a planned law enforcement action – such as serving a search warrant on a company suspected of price-fixing, or on a sweatshop – might have an adverse effect on a business. That is not and cannot be the law, and not surprisingly, Swift points to no case requiring such notice.

Instead, the Constitution is satisfied when, prior to such an enforcement action, the Government procures a warrant authorizing that action.[3] A warrant requires review by a neutral and detached magistrate or judge and does not merely rely upon a determination of the existence

---

[3] None of the many circuit or Supreme Court cases approving the use of *ex parte* administrative warrants have even hinted that the very practice approved might actually violate the Constitution. See, e.g., Marshall v. Barlow's, Inc., 436 U.S. 307, 320-21 (1978); Stoddard Lumber Co. v. Marshall, 627 F.2d 984, 989-90 (9th Cir. 1980); National-Standard Co. v. Adamkus, 881 F.2d 352, 362-63 (7th Cir. 1989) ("*[E]x parte* proceedings are the normal means by which warrants are obtained in both criminal and administrative actions . . ."). Moreover, a number of cases uphold the government's authority to seek administrative inspection warrants *ex parte* under various statutes. See, e.g., Bunker Hill Co. Lead & Zinc Smelter v. EPA, 658 F.2d 1280, 1285 (9th Cir. 1981) (Clean Air Act); In re Establishment Inspection of Keokuk Steel Castings, 638 F.2d 42, 45 (8th Cir. 1981) (Occupational Safety and Health Act); In Re Alameda County Assessor's Parcel Nos. 537-801-2-4 & 537-850-9, 672 F. Supp. 1278, 1287 (N.D. Cal. 1987) (Clean Water Act); In re Stanley Plating Co., Inc., 637 F. Supp. 71, 73 (D. Conn. 1986) (Resource Conservation and Recovery Act).

MEM. DFTS' OPP. TO P.I. – 9
(2-06CV-314-J)

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C. 20004-1703
Tel (202) 616-9752; Fax (202) 233-0397

1  of probable cause by an officer "engaged in the often competitive enterprise of ferreting out

2  crime." <u>Johnson v. United States</u>, 333 U.S. 10 (1948). ICE has every intention of seeking and

3  obtaining a warrant from a neutral magistrate, supported by probable cause, prior to moving

4  forward with any significant enforcement action aimed at identifying illegal aliens. Allen Decl.

5  at ¶ 2 (Appendix 2). Further, it is well established that ICE, like any other law enforcement

6  agency, may seek and obtain a warrant <u>ex parte</u>. <u>See</u> <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307,

7  320-21 & n.15 (1978); <u>Stoddard Lumber Co. v. Marshall</u>, 627 F.2d 984, 989 (9th Cir. 1980); <u>cf.</u>

8  <u>Midwest Growers Co-op Corp. v. Kirkemo</u>, 533 F.2d 455, 464 n.21 (9th Cir. 1976) (obtaining

9  administrative warrant <u>ex parte</u> does not constitute bad faith because this is the "traditional

10  method" for obtaining warrants). Indeed, the use of civil orders to authorize the entry upon

11  premises where illegal aliens are believed to be present and to permit their questioning and arrest

12  has longstanding judicial approval. <u>See</u> <u>Blackie's House of Beef, Inc. v.Castillo</u>, 569 F.2d 1211,

13  1219-27 (D.C. Cir. 1981), <u>cert.</u> <u>denied</u>, 455 U.S. 940 (1982).[4]

14      In this case, ICE will not proceed with the anticipated workplace enforcement action (or any

15  other type of search without Swift's consent) in a particular plant unless and until ICE obtains a

16  warrant from a magistrate judge.[5] Allen Decl. at ¶ 2 (Appendix 2). The impact that the workplace

17  enforcement action will have on Swift is one of the many factors that the magistrate judge will

18  consider before issuing the warrant. <u>See</u> <u>Johnson</u>, 333 U.S. at 14 ("[A] magistrate must judge the

19  reasonableness of every warrant in light of circumstances of the particular case, carefully

20  considering the description of the evidence sought, the situation of the premises, and the position

21  and the situation of the owner or occupant."). Critically, then, a process already exists in which

22  a neutral judge will independently balance particularized facts regarding the anticipated workplace

23  enforcement action. That is all the Constitution requires. This litigation is nothing more than an

24

25

26    [4] The investigation may also produce information which will lead to the criminal prosecution of some aliens.

27    [5] It is well settled that the Immigration and Nationality Act (INA) authorizes ICE Special
28  Agents to question any alien or person believed to be an alien regarding his or her immigration status and their right to be present in the United States. <u>See</u> INA § 287(a)(1), 8 U.S.C. § 1357(a)(1).

MEM. DFTS' OPP. TO P.I. – 10
(2-06CV-314-J)

1   attempt by Swift to forestall that consideration by requesting an adjudication of the potential harms

2   without consideration of the specific facts to be provided by ICE to the magistrate.

3   Second, even if Swift had some right to be given notice of the workplace enforcement action

4   (which it does not), it can hardly claim lack of notice in this case. Indeed, according to Swift's

5   own pleadings, notice was given to Swift of the planned workplace survey on at least two

6   occasions, on November 17, 2006 and again on November 20, 2006. See Complaint, ¶ 15. Thus,

7   Swift's claim that it was not provided notice is simply false as Swift has received far more notice

8   and consideration than required. In fact, in an effort to work out a compromise process, ICE

9   contacted Swift regarding the scheduled action, sought Swift's consent, outlined the proposed

10  measures it would take to ensure the safety of workers, and provided Swift with sufficient time

11  to rearrange workflow and deliveries to lessen the impact on production. Allen Decl. at ¶ 7

12  (Appendix 3-4). Swift declined to consent to the workplace enforcement action, citing economic

13  concerns. Id. (Appendix 4).

14  Third, the effects of the anticipated workplace enforcement action that Swift fears are related

15  to the loss of employees who are illegally working in the United States. There is no taking of

16  Swift's property, as Swift has no property interest in its employees. Nor does Swift have a

17  privilege to employ illegal workers by virtue of the Basic Pilot program once the illegal nature of

18  those employees is discovered. The alleged costs of the ICE workplace enforcement action to

19  Swift do not constitute a deprivation of property in the constitutional sense. Cf., e.g., FTC v.

20  Standard Oil Co. of California, 449 U.S. 232, 242-43 (1980) (the cost of defending against an

21  investigation, "even substantial and unrecoupable cost, does not constitute irreparable injury"). In

22  conclusion, a process is already in place – the warrant process – which provides an independent

23  balance of particularized facts regarding the potential search, and thus Swift's claims of a due

24  process violation must fail.

25  Also relevant under the Mathews v. Eldrige balancing test, 424 U.S. 319, 334 (1976) is the

26  burden of the Government of providing additional process. As set forth below, the Government

27  (and public) woudl suffer substantial harm as a result of Swift's proposed approach.

28

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C.  20004-1703
Tel (202) 616-9752;  Fax (202) 233-0397

**4. INA § 242(f) Deprives Courts Of Jurisdiction To Enter An Injunction Against The Operation of INA § 236.**

On top of all this, courts simply do not have jurisdiction to issue the injunction that Swift seeks. Under the plain text of the Immigration and Nationality Act ("INA"), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." INA § 242(f), 8 U.S.C. § 1252(f). Part IV of the relevant subchapter, aptly titled "Inspection, Apprehension, Examination, Exclusion, and Removal," includes INA § 236, which provides that "an alien may be arrested or detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis added).

Swift nonetheless requests that the Court enjoin ICE's planned efforts to apprehend and detain illegal immigrants employed and located at their facilities. Indeed, Swift concedes that ICE's planned workplace enforcement action is a "removal action," and that this action is intended to identify possible illegal aliens "for further questioning and possible deportation." Complaint at ¶ 5. These actions that Swift seeks to enjoin – the apprehension and detention of aliens working at their facilities pending removal – are specifically authorized by INA § 236. See, e.g., Baldwin Metals Co., Inc., v. Donovan, 642 F.2d 768, 773 n.9 (5th Cir. 1981) ("'Were an employer given the power to invoke the district court's jurisdiction on the eve of a scheduled hearing before the Review Commission whenever an inspection warrant is challenged on constitutional grounds, we might well sunder the statutory balance between swift abatement of dangerous conditions and due process protections.'") (quoting Babcock & Wilcox Co. v. Marshall, 610 F.2d 1128, 1140 (3d Cir. 1989)). Accordingly, INA § 242(f) specifically prohibits this Court from granting Swift's requested injunction against those actions.[6]

---

[6] In addition, Swift fails even to plead a valid jurisdictional basis for this suit in the first place. It is beyond peradventure that the federal courts are courts of limited jurisdiction, and the burden is on the plaintiff to demonstrate proper jurisdiction. Swift has failed this most elementary burden. As discussed supra, Swift pleads jurisdiction under two federal statutes – 28 U.S.C. § 1491(a)(1) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 – neither one of which vests this Court with jurisdiction. The first statute involves the jurisdiction of the United States Court of Federal Claims, while the Declaratory Judgment Act "is not an independent ground for jurisdiction [and] permits the award of declaratory relief only when other bases for jurisdiction are present." Jones v. Alexander, 609 F.2d 778, 781 (5th Cir.

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C. 20004-1703
Tel (202) 616-9752; Fax (202) 233-0397

5. The Court Ought Not Enjoin Judicial Officers In Other Judicial Districts.

Finally, this Court should not enjoin judicial officers in other judicial districts. Prior to entering, ICE will obtain a judicial warrant authorizing entry, unless Swift decides to consent to entry. Allen Decl. at ¶ 2 (Appendix 2). By seeking to enjoin ICE's enforcement efforts, Swift essentially requests that the Court enjoin those judicial officers, in other districts, from independently reviewing ICE's warrant request and determining the propriety of issuing such warrants. But principles of comity counsel that this Court ought not enjoin or restrain judicial officers in other districts from proceeding with their review of ICE's warrant requests. Cf. Society of Separationists, Inc. v. Herman, 939 F.2d 1207, 1219 (5th Cir.1991), rev'd en banc on other grounds, 959 F.2d 1283 (5th Cir.1992) (stating that principles of "comity and decorum" suggest that federal courts should not enjoin state judges unless necessary). "The 'federal-comity doctrine' is defined as '[t]he principle requiring federal district courts to refrain from interfering in each other's affairs.'" In re Repurchase Corporation, Debtor, 329 B.R. 832 (N.D. Ill. 2005) (citing Black's Law Dictionary (8th ed. 2004)). The federal courts long have recognized that the principle of comity requires federal district courts – courts of coordinate jurisdiction and equal rank – to exercise care to avoid interference with each other's affairs. West Gulf Maritime Ass'n. v. Ila Deep Sea Local 24, 751 F.2d 721 (5th Cir. 1985).

In Saleh v. Titan Corp., 353 F. Supp. 2d 1087 (S.D. Cal. 2004), plaintiffs, who were individuals detained and allegedly abused in Iraqi prisons under United States control, asked the court to enjoin an action in another district. Plaintiffs moved to enjoin a subsequently-filed action by other putative class members. The court stated that "'[w]hen an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunction should be granted only in the

_____

1980).
Moreover, the controversy must be "definitive and concrete." Aetna Life Ins. Co. Of Hartford, Conn. v. Haworth, 300 U.S. 227, 228-241 (1937). The court must examine whether the facts demonstrate that a substantial controversy exists, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. Here, there is no controversy because Swift and ICE agree that Swift employees have evaded the Basic Pilot verification program and may have engaged in identity theft and fraud; and Swift is only seeking a remedy. Complaint at ¶¶ 5-7, 11.

MEM. DFTS' OPP. TO P.I. – 13
(2-06CV-314-J)

1   most unusual cases.'" Id. at 1089 (citing Bergh v. State of Washington, 535 F.2d 505 (9th Cir.

2   1976)).  The court also noted, citing another Ninth Circuit opinion, that as a matter of comity, a

3   federal court injunction against proceedings in another federal court will rarely be granted.  Id.

4   (citing Del Mar Avionics v. Quinton Instruments Co., 645 F.2d 832 (9th Cir. 1981)).  The district

5   court in this case determined that it did not have the authority to enjoin putative class members

6   from pursuing a subsequently-filed action in another federal forum.  Id. at 1094.

7       B. SWIFT HAS NOT ESTABLISHED THAT IT WILL SUFFER IRREPARABLE HARM.

8       In any event, even if Swift had shown a substantial likelihood of success on the merits, it

9   failed to demonstrate a substantial threat of irreparable injury.  Swift's claim of harm is

10  inextricably tied to its refusal to cooperate fully with the United States Government in ridding its

11  own chosen workforce of illegal aliens and in allowing the apprehension of those who engage in

12  identity theft and fraud.  Its hands are unclean, and the Court should decline to ratify the alleged

13  harm.  Anytime there is law enforcement action, those who violate the law will suffer harm.  But

14  that of course is no reason to enjoin law enforcement and allow Swift to provide a sanctuary to

15  illegal aliens who have also engaged in identity and document fraud.

16      Moreover, Swift falls far short of demonstrating actual or potential irreparable harm because

17  its affidavits are self-serving, unsupported by independent evidence, and contain nothing more

18  than speculation.  See generally Declaration of Jack Shandley (in Plaintiff's Appendix) at ¶¶ 49-

19  51, 61, 63-64.  For example, Swift merely notes without foundation that it "believes that it would

20  suffer serious, irreparable injury," id. ¶ 49, and similarly "believes" (again without foundation) that

21  it would take two months to mitigate these speculative harms by hiring new employees, id. ¶ 51.

22  Swift also avers that it "appears that" at least one production day will be lost at its plants.  Id. ¶ 61.

23  Finally, Swift notes a mass removal of identity thieves "could cause" Swift a parade of horribles.

24  Id. ¶ 63.  Thus, as the tentative language of Swift's own self-serving declaration indicates, it has

25  failed its burden to establish a likelihood of injury that is certain and irreparable (much less legally

26  actionable), not merely speculative.  And such claims of "speculative injury [are] not sufficient"

27  to justify a preliminary injunction.  Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 997

28  (5th Cir. 1985); see also Humana, Inc. v. Jacobson, 804 F.2d 1390, 1394 (5th Cir. 1986) (requiring

MEM. DFTS' OPP. TO P.I. – 14
(2-06CV-314-J)

1  a showing of a "significant threat of injury" or that "injury is imminent" before injunctive relief

2  will be granted). On this ground alone, the Court should deny Swift's motion for emergency

3  injunctive relief. See Enterprise Intern. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d

4  464, 472 (5th Cir. 1985).

5      Moreover, while Swift conjures up a worst-case scenario, it has failed to work with ICE to

6  craft a plan that would reduce the magnitude of the disruption to their business. Allen Decl. at

7  ¶¶ 7-8 (Appendix 3-4). By contrast, ICE has taken significant efforts to minimize any harm to

8  Swift's facilities and operations. Id. at ¶¶ 7, 10 (Appendix 3, 5). ICE has even coordinated with

9  the Department of Agriculture and with the Food Safety Inspection Service to reduce the risk of

10  product contamination in the plants and to increase the safety factor to both the employees and

11  agents. Id. at ¶ 10 (Appendix 5). Both the logistics and timing of the operation are intended to

12  increase safety. Id. ICE's prudent actions in preparation render even more remote the likelihood

13  of significant, irreparable harm to Swift. Notably, Swift's claim contains an ironic twist, asking

14  the Court to consider the deprivation in earnings it will suffer if it is not allowed to continue to

15  profit through the use of illegal and unauthorized employees.

16      C.   THE BALANCE OF HARMS TIPS AGAINST SWIFT.

17      In addition to Swift putting forth no legally cognizable claims or irreparable harm, the

18  balance of harms required by the preliminary injunction analysis tips sharply against Swift. The

19  preliminary injunction requested by Swift will have a profound negative impact on defendants by

20  adversely affecting this and other investigations. As an initial matter, "[i]t is not for the courts to

21  interfere with Congress' broad authority to govern immigration." Gunaydin v. INS, 742 F.2d 776,

22  779 (9th Cir. 1984). As the Supreme Court has recognized, "Congress designs the immigration

23  laws, and it is up to Congress to temper the laws' rigidity if it so desires." INS v. Phinpathya, 464

24  U.S. 194, 196 (1984).

25      Congress vested DHS, and more specifically, ICE, with the authority for and responsibility

26  of immigration enforcement. See The Homeland Security Act of 2002, Pub. L. No. 107-296,

27  § 441, 116 Stat. 2153 (2002); Allen Decl. at ¶ 11 (Appendix 5). The decision whether to

28  investigate a case and refer it for enforcement proceedings is, in the ordinary course, committed

MEM. DFTS' OPP. TO P.I. – 15
(2-06CV-314-J)

1  to the discretion of the investigative agency. See Lewis v. U.S., 70 F.3d 597, 601 (Fed. Cir. 1995).

2  In the absence of statutory directions as to the manner in which an investigation must be conducted

3  by an administrative agency or official, the nature and extent of an investigation are matters within

4  the sound discretion of administrative officials, and courts give substantial deference to the

5  methods chosen by an agency to fulfill its responsibility.  See Former Employees of Alcatel

6  Telecommunications Cable v. Herman,  134 F. Supp. 2d 445, 448 (Ct. Int'l Trade 2001).

7      The "phased approach" recommended by Swift "would alert illegal aliens in the Swift

8  workforce to the ICE investigation, allowing them to disappear from Swift plants and elude law

9  enforcement." Allen Decl. at ¶¶ 9, 11 (Appendix 4-5).  ICE has a duty to apprehend illegal aliens

10  and remove them from this country. Id. at 11 (Appendix 5).  Further, the illegal aliens in Swift's

11  workforce appear to have obtained their employment through identity fraud, making the

12  apprehension and detention of these aliens an even greater concern. See id. at ¶ 12.  Issuance of

13  an injunction prohibiting the planned worksite surveys would allow many of these aliens to

14  disappear and move elsewhere within the United States, negatively impacting ICE's ability to

15  locate and remove them. Id. at ¶¶ 11-12.  Swift acknowledges as much in its "Motion for Leave

16  to File Under Seal," averring that absent a sealed record, "unauthorized workers may leave and

17  thus frustrate the goal of identifying and removing unauthorized workers from Swift's work

18  force."

19      ICE has already planned the transportation and logistical accommodations for federal law

20  enforcement agents who have been designated to participate in the operation, in addition to

21  training the agents and managers in plant operations, safety concerns, and ways to reduce product

22  contamination during the survey. Id. at ¶¶ 10, 13 (Appendix 5-6).  United States citizens who have

23  needlessly suffered varied financial harms and indignities because their identities were stolen by

24  unauthorized workers, and thereafter approved by Swift for employment, will be subject to further

25  losses unless these identity thieves can be apprehended in Swift plants.  ICE's effectiveness in

26  apprehending illegal aliens and the adverse effects on the investigation are concrete harms that

27  would result from a preliminary injunction. Accordingly, the balance of harms favors Defendants.

28

MEM. DFTS' OPP. TO P.I. – 16
(2-06CV-314-J)

### D.   THE PUBLIC INTEREST CLEARLY FAVORS THE GOVERNMENT'S ABILITY TO ENFORCE IMMIGRATION LAW.

Should an injunction enter, the harm to the public interest reaches beyond the immediate effects of halting the planned operation with respect to Swift.  As the Secretary of Homeland Security has concluded:

> Illegal immigration hurts everyone.  It flouts the rule of law, and it allows criminal elements to enter our country.  It undercuts those who patiently pursue legal immigration proceedings.  It places heavy economic strains on towns…[a]nd it threatens the lives of the migrants themselves.  The human smugglers and traffickers…who bring them to the country all too often rob them, abuse them and leave them for dead.  In addition to this human cost, these smugglers also traffic in guns and narcotics, a threat to the stability of both the United States and Northern Mexico.  [I]f we can not control our borders, we leave the way open for terrorists hoping to do us harm.

Statement of Secretary Michael Chertoff, Comprehensive Immigration Reform II, before the United States S. Judiciary Comm. (2005), submitted as Exhibit 2, Appendix 7-13.

Moreover, both Swift and ICE believe that illegal aliens in the Swift workforce are engaging in identity theft.  Such identity theft is a real and substantial harm to the public at large.  See Pl. Appendix at 178-91 (GAO, Identity Fraud, Prevalence and Links to Alien Illegal Activities); Arnold Hamilton, Business of Fake Documents Is Booming:  Innocent People Often The Victims Of ID Theft, Dallas Morning News (Nov. 17, 2006), submitted as Exhibit 3, Appendix 14-16.  Identity theft includes the use of fraudulent identity documents, which have been used in connection with narcotics trafficking and terrorism.  Pl. Appendix at 178-79, 187-89.  Likewise, the 9/11 Commission recognized that "[f]or terrorists, travel documents are as important as weapons."  National Commission on Terrorist Attacks Upon the United States, 2004 WL 1634832 at 351.  Moreover, the use of a United States citizen's identity by an illegal alien to obtain employment is not a victimless crime, as the individual citizens may be faced with debt collection enforcement, credit denials, and other harms.  See Pl. Appendix at 113-41 (GAO, Identity Fraud, Prevalence and Cost Appear to Be Growing); Arnold Hamilton, Business of Fake Documents Is Booming:  Innocent People Often The Victims Of ID Theft, Dallas Morning News (Nov. 17, 2006), Appendix 14-16.  Accordingly, the public interest favors the identification and apprehension of those involved in identity theft, and would be adversely impacted by the requested injunction.

MEM. DFTS' OPP. TO P.I. – 17
(2-06CV-314-J)

1   If the Court grants Swift's request for a preliminary injunction, it will cripple ICE's ability
2   to execute its Congressional mandate of enforcing the nation's immigration laws and removing
3   illegal immigrants.  See CRS Report for Congress, Border Security: Key Agencies and Their
4   Missions (2004), submitted as Exhibit 4, Appendix 17-22.  ICE is the largest investigative branch
5   of DHS, which was created after the terrorist attacks of September 11, 2001, to more effectively
6   enforce our immigration and customs laws and to target the people, money, and materials that
7   support terrorist and criminal activities.  See U.S. Immigration and Customs Enforcement website,
8   at http://www.ice.gov/about/index.htm, submitted as Exhibit 5, Appendix 23-24.  Effective
9   worksite enforcement plays an integral role in ICE's fight against illegal immigration and, more
10  broadly, in ICE's efforts to promote national security, protect critical infrastructure, and ensure
11  fair labor standards.    See U.S. Immigration and Customs Enforcement website, at
12  http://www.ice.gov/pi/worksite, submitted as Exhibit 6, Appendix 25.  A large aspect of worksite
13  enforcement efforts focuses on preventing access to critical infrastructure sectors and sites to
14  prevent terrorism and to apprehend those individuals who aim to do harm to the United States.
15  See Immigration Enforcement at the Workplace: Learning From the Mistakes of 1986, before the
16  United States S. Comm. On the Judiciary, Subcomm. on Immigration, Border Security and
17  Citizenship (2006) (statement of Julie L. Myers, Assistant Secretary, U.S. Immigration and
18  Customs Enforcement, U.S. Department of Homeland Security), submitted as Exhibit 7, Appendix
19  26-30.  The nation's food supply is part of that critical infrastructure.  In addition to critical
20  infrastructure protection, worksite enforcement also combats alien smuggling, human trafficking,
21  financial crimes, commercial fraud, export violations, and document fraud.  Id.  Hence, a ruling
22  to temporarily enjoin ICE from enforcement efforts in this case would hinder ICE's mandate to
23  enforce the nation's laws at worksites, laws that it is charged with enforcing.  See Savoury v. U.S.
24  Attorney General, 449 F.3d 1307, 1320 (11th Cir. 2006) (citing INS v. Hibi, 414 U.S. 5, 8 (1973)).
25  Granting the requested injunction would be tantamount to inviting any business that fears
26  investigation to seek a civil remedy to prevent lawful worksite enforcement:  any company that
27  fears investigation will be en route to the courthouse in an effort to delay, minimize, dictate, or
28  eliminate the prospect of enforcement action.  Moreover, these same tactics could be employed

MEM. DFTS' OPP. TO P.I. – 18
(2-06CV-314-J)

1   by any business seeking to avoid investigations conducted by other federal law enforcement

2   agencies. It is beyond question that such limitations on lawful government action would seriously

3   harm the public interest.

4       Indeed, any order that enjoins a governmental entity from enforcing statutes enacted by the

5   duly elected representatives of the people constitutes an irreparable injury that weighs heavily

6   against the entry of injunctive relief. See Coalition for Economic Equity v. Wilson, 122 F.3d 718,

7   719 (9th Cir. 1997) (citing New Motor Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1351

8   (1977) (Rehnquist, J., in chambers)); INS v. Miranda, 459 U.S. 14, 19 (1982) (noting the

9   "increasingly important interest, implicating matters of broad public concern [that] is involved in

10  cases of this kind [that involve] [e]nforcing the immigration laws . . ." and thus refusing to estop

11  the government). Accordingly, the public interest strongly disfavors the requested injunction, and

12  Swift's demands to frustrate this process should fail.

13                                  CONCLUSION

14      Plaintiff's case fails every test for preliminary injunctive relief, and Plaintiff's motion should

15  therefore be denied for any or all the reasons set out above.

16  Dated:    December 4, 2006

17                          Respectfully submitted,

18                          RICHARD ROPER
                            United States Attorney

19
                            GORDON BRYANT
20                          Assistant United States Attorney

21  PETER D. KEISLER
    Assistant Attorney General
22  JONATHAN F. COHN
    Deputy Assistant Attorney General
23  DAVID KLINE
    Principal Deputy Director

24

25  By: _Elizabeth J. Stevens (by permission  /GB/_
    ELIZABETH J. STEVENS               Gordon Bryant
26  Trial Attorney, Office of Immigration Litigation
    United States Department of Justice, Civil Division
27  1331 Pennsylvania Avenue, N.W.
    Washington, D.C. 20044
28  Telephone: (202) 616-9752
    Fax: (202) 353-7224

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C. 20004-1703
Tel (202) 616-9752; Fax (202) 233-0397

## CERTIFICATE OF SERVICE

1

2

3     I certify that on the _4_ day of December. 2006, a true and correct copy of the foregoing

4  document was forwarded to the following by Federal Express Overnight delivery and by e-mail,

5  as follows:

6  Plaintiffs:

7  William E. Lawler, III
   wlawler@velaw.com
8  C. Michael Buxton
   Vinson & Elkins, L.L.P.
9  The Willard Office Building
   1455 Pennsylvania Avenue, Suite 600
10 Washington, D.C. 20004
   Fed Ex and email

11
   Kevin A. Isern
12 Lovell, Lovell, Newsome & Isern, L.L.P.
   112 West 8th Avenue, Suite 1000
13 Amarillo, TX 79101-2314
   Email only

14

15                              By: _____

16                                   D. GORDON BRYANT, JR.
                                     Assistant U. S. Attorney
17

18

19

20

21

22

23

24

25

26

27

28

MEM. DFTS' OPP. TO P.I. – 20
(2-06CV-314-J)

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
1331 PENNSYLVANIA AVE., N.W., NPB 1148-14
WASHINGTON, D.C. 20004-1703
Tel (202) 616-9752; Fax (202) 233-0397